## MICHAEL GIANNECCHINI *v.* HOSPITAL OF ST. RAPHAEL

Superior Court      Judicial District of New Haven      File No. CV990430590S

Memorandum filed May 22, 2000

*Gesmonde, Pietrosimone, Sgrignari & Pinkus*, for the plaintiff.

*Tyler, Cooper & Alcorn*, for the defendant.

## I

## INTRODUCTION

BLUE, J. The cross motions for summary judgment in this breach of contract case present an important question of public policy concerning the removal and disclosure of information contained in employee personnel files. To simplify only a little, the situation is this: An employer fires an employee. The employee gets an attorney, and the employee and the employer hammer out a contract in which it is agreed that the employee will be allowed to resign voluntarily and all references to involuntary termination in his personnel file will be expunged. Later, the employee applies for a job with a new potential employer. The new potential employer requires the employee to sign a preprinted authorization and release form authorizing previous employers to disclose information concerning his background and releasing employers who provide such information from liability. The new potential employer contacts the previous employer—the very previous employer which agreed to expunge the termination information from its files—and the previous employer spills the beans. Is there liability here?

The parties agree that the controlling public policy has been articulated by the legislature, at least in general terms, but they disagree as to how that policy is to be applied to the documents that they have signed. As will be seen, there is indeed devil in the details, but the controlling legislation goes a long way towards solving the problem. It is necessary to begin with the facts.

## II

## THE FACTS

The facts that control this decision are not in dispute. The plaintiff, Michael Giannecchini, is a nurse. He was originally hired as a stock clerk by the defendant Hospital of St. Raphael (the hospital) in 1989. He received a nursing degree in 1992. During the following year, Giannecchini received one or more warnings relating to medication errors. On March 24, 1993, the hospital involuntarily terminated his employment. Giannecchini's termination was memorialized in a written document, which is in evidence. (The survival of this document, as will be seen in a moment, is itself one of the issues in this case.) That document, signed by Annie Pietrandrea, as the hospital's director of personnel on March 31, 1993, contains a "Remarks" section which states: "Several serious medication errors." The document also rates Giannecchini as "Average" with respect to "Attitude," "Personality" and "Attendance" and "Below Average" with respect to "Ability" and "Industry."

Giannecchini quickly obtained an attorney (not the attorney who represents him in this action). His attorney contacted the hospital, and the attorney and the hospital agreed upon a contract to resolve the differences between the parties. This document, entitled "Settlement Agreement and Release" (the agreement), was

executed by the parties on April 30, 1993. The important provisions of this contract are as follows:

"1. Michael Giannecchini will voluntarily resign from his employment with the Hospital effective March 24, 1993.

"2. The Hospital agrees that Mr. Giannecchini's personnel file(s) [and] any associated file(s) kept by the Hospital will reflect a voluntary resignation effective March 24, 1993. Any and all references in said file(s) to an involuntary termination of the employment of Giannecchini will be expunged.

"3. The Hospital agrees that in the event any job references are required or any inquiries, whether oral or written, are made respecting Giannecchini's employment with the Hospital, the Hospital, and any of its officials who are authorized to disclose such information or to whom such job reference requests or inquiries are directed, shall respond to said request or inquiries with a statement indicating that the Hospital's policy is strictly limited to disclosure of dates of service, title and position and salary information. The Hospital may only indicate such facts and may disclose no more except upon express written authorization by Giannecchini . . . .

"8. In the event that the Hospital breaches any of the foregoing provisions with respect to the content and dissemination of Giannecchini's personnel file(s) or the Hospital's obligations with respect to job inquiries and references, Giannecchini shall have the right to bring an action pursuant to this Agreement and to seek any lawful remedy to which he is entitled."

In the year or so following the execution of this agreement, Giannecchini applied for positions with a number of health care providers. The evidence suggests

that the hospital acted in accordance with the agreement in these instances.

In December, 1994, Giannecchini applied for a position as a registered nurse with the Department of Veterans' Affairs Hospital in West Haven (the VA). On December 26, 1994, he filled out a written application supplied by the VA. Giannecchini listed the hospital as a former employer and wrote under that listing, "Please contact [Personnel] Department." As part of the application process, the VA required Giannecchini to sign a preprinted form entitled "Authorization for Release of Information" (the authorization). Giannecchini executed this form on December 27, 1994. That authorization form provides, in relevant part, as follows:

"In order for the Department of Veterans Affairs (VA) to assess and verify my educational background, professional qualifications and suitability for employment, I:

"Authorize the VA to make inquiries concerning such information about me to my previous employer(s), current employer, educational institutions, State licensing boards, professional liability insurance carriers, other professional organizations and/or persons, agencies, organizations or institutions listed by me as references, and to any other appropriate sources to whom the VA may be referred by those contacted or deemed appropriate;

"Authorize release of such information and copies of related records and/or documents to VA officials;

"Release from liability all those who provide information to the VA in good faith and without malice in response to such inquiries; and

"Authorize the VA to disclose to such persons, employers, institutions, boards or agencies identifying and other information about me to enable the VA to make such inquiries."

On February 13, 1995, the VA sent the hospital a letter stating that Giannecchini had applied for a position and requesting information. It enclosed a copy of the authorization just quoted.

On February 14, 1995, Annie Pietrandrea (who had previously executed Giannecchini's termination document as the hospital's director of personnel) wrote a letter to the VA in her capacity as "Coordinator, HRIS." (Pietrandrea describes herself in a 1999 affidavit as holding "the position of Human Resources Consultant.") This letter states as follows:

"Michael J. Giannecchini was employed at the Hospital of St. Raphael from 1/16/89 to 3/24/93. He was an R.N.-I. He was a full time employee (40 hours per week). He was discharged. He is not eligible to be re-hired.

"Average: Attitude, Personality, Attendance

"Below Average: Ability, Industry

"If you need further information, please feel free to contact me at (203) 789-4324."

Upon receipt of the letter just quoted, Gail Howard, a credentialing specialist employed by the VA, called Pietrandea to discuss her response. A written report of contact prepared by Howard states in pertinent part that:

"I asked Ms. Pietrandea to explain the circumstances surrounding Mr. Giannecchini's discharge from the Hospital of St. Raphael. After reviewing his record, Ms. Pietrandea stated, 'All I show here is several serious medication errors.'

"The Associate Chief, Nursing Service & Education was notified and advised of the above . . . ."

Giannecchini did not get the job. On October 14, 1996, he commenced this action by service of process.

Giannecchini is the sole plaintiff, and the hospital is the sole defendant. Giannecchini's revised amended complaint consists of three counts. The first count alleges breach of contract, the contract in question being the "Settlement Agreement and Release" executed on April 30, 1993. The second count alleges breach of a covenant of good faith and fair dealing in connection with that agreement. The third count, based on the communications made to the VA, alleges defamation.

On July 16, 1999, the hospital filed the defendant's motion for summary judgment now before the court. The motion seeks judgment on all three counts.

On October 15, 1999, Giannecchini filed the plaintiff's cross motion for summary judgment also before the court. The cross motion seeks judgment as to liability only on all three counts.

The motions were heard together on May 15, 2000.

### III

### DISCUSSION

### A

### The Breach of Contract Claim

### 1

### Public Policy

Putting the issue of Giannecchini's authorization form to one side, the breach of contract claim presented in the first count of his revised amended complaint is, on its face, a formidable one. The hospital undertook by contract to expunge all references in its files to "an involuntary termination of the employment of Giannecchini" and to supply "strictly limited" responses to requests for disclosure by future potential employers. The hospital's February, 1995 communications violated each of these provisions.

The effect of the authorization is a hotly contested matter. Before reaching that issue, however, another issue must briefly be considered. Assuming for purposes of argument that the authorization is effective, is judicial enforcement of paragraphs 2 and 3 of the aforementioned agreement executed April 30, 1993, consistent with public policy? The court posed this question to the parties at a preargument scheduling conference, and the parties subsequently submitted exceedingly helpful supplemental briefs on the subject. Put in a nutshell, the public policy concern is this: Paragraphs 2 and 3 of the agreement may be advantageous to the parties to the contract—Giannecchini gets the limited disclosure he wants, and the hospital avoids a potentially messy lawsuit—but the contract affects a third interest unrepresented at the bargaining table. That interest is the interest of the patient. A patient in a hospital is frequently helpless and utterly dependent on the nurses assigned to care for him. Any patient in any hospital would surely hope that the hospital hiring his nurses would receive full information about any medication errors that the nurse had committed in the course of prior health care employment. As far as the patient is concerned, this is potentially a life and death matter. It is no answer to the patient's legitimate concerns that a contract of silence is mutually advantageous between the nurse and his former employer. A contract of this nature is affirmatively disadvantageous to the patient. If contractual provisions like this are judicially enforceable, some of the most vulnerable citizens in our society—patients in hospitals—will inevitably be exposed to a risk of physical harm. Cf. *Bowman v. Parma Board of Education*, 44 Ohio App. 3d 169, 172–73, 542 N.E.2d 663 (1988) (contract prohibiting school district from disclosing teacher's pedophilia to school district that subsequently employed teacher held void as against public policy).

Public policy, it has famously been said, "is a very unruly horse, and when once you get astride it you never know where it will carry you." *Richardson* v. *Mellish*, 130 E.R. 294, 303 (1824). The parties have persuaded the court that, in Connecticut, the public policy horse in question here has been saddled by the legislature. Two related statutes govern the removal and disclosure of information contained in employee personnel files: General Statutes §§ 31-128e and 31-128f. These statutes provide as follows:

"[General Statutes] Sec. 31-128e. Removal or correction of information. Employee's explanatory statement. If upon inspection of his personnel file or medical records, an employee disagrees with any of the information contained in such file or records, removal or correction of such information may be agreed upon by such employee and his employer. If such employee and employer cannot agree upon such removal or correction then such employee may submit a written statement explaining his position. Such statement shall be maintained as part of such employee's personnel file or medical records and shall accompany any transmittal or disclosure from such file or records made to a third party."

"[General Statutes] Sec. 31-128f. Employee's consent required for disclosure. No individually identifiable information contained in the personnel file or medical records of any employee shall be disclosed by an employer to any person or entity not employed by or affiliated with the employer without the written authorization of such employee except where the information is limited to the verification of dates of employment and the employee's title or position and wage or salary or where the disclosure is made: (1) To a third party that maintains or prepares employment records or performs other employment-related services for the employer;

(2) pursuant to a lawfully issued administrative summons or judicial order, including a search warrant or subpoena, or in response to a government audit or the investigation or defense of personnel-related complaints against the employer; (3) pursuant to a request by a law enforcement agency for an employee's home address and dates of his attendance at work; (4) in response to an apparent medical emergency or to apprise the employee's physician of a medical condition of which the employee may not be aware; (5) to comply with federal, state or local laws or regulations; or (6) where the information is disseminated pursuant to the terms of a collective bargaining agreement. Where such authorization involves medical records the employer shall inform the concerned employee of his or her physician's right of inspection and correction, his right to withhold authorization, and the effect of any withholding of such authorization upon such employee."

"Employee" is a statutorily defined term meaning "any individual currently employed or formerly employed by an employer . . . ." General Statutes § 31-128a (1). "Personnel file" means "papers, documents and reports pertaining to a particular employee which are used or have been used by an employer to determine such employee's eligibility for employment, promotion, additional compensation, transfer, termination, disciplinary or other adverse personnel action including employee evaluations or reports relating to such employee's character, credit and work habits." General Statutes § 31-128a (3).

The statutes just quoted are part of a comprehensive legislative scheme enacted in 1979; see Public Acts 1979, No. 79-264; dealing with the integrity and disclosure of employee personnel files. It is clear from the statutory text that the legislature intended to cover the field pertaining to this subject matter and did so with some care. It is particularly important that § 31-128f sets forth

a number of specific, tightly crafted exceptions to the general rules governing statutory disclosure or nondisclosure. There is no exception for employee records, like the termination notice in the present case, concerning employees whose future employment implicates the safety of third parties such as hospital patients. The wisdom of such an additional exception is beside the point. Under the circumstances, that must be a matter for the legislature. For this reason, the court agrees with the parties that the public policy controlling this case is set forth in §§ 31-128e and 31-128f.

The relationship of the controlling statutes must now be considered. Section 31-128e provides in pertinent part that, "[i]f upon inspection of his personnel file . . . an employee disagrees with any of the information contained in such files . . . removal . . . of such information may be agreed upon by such employee and his employer." Section 31-128f then provides in pertinent part that, "No individually identifiable information contained in the personnel file . . . of any employee shall be disclosed by an employer . . . without the written authorization of such employee . . . ." The question of what information is "contained in the personnel file" for purposes of § 31-128f must be answered with reference to the "removal" provision of § 31-128e. If an employee and his employer have previously agreed upon the "removal" of specified information from the employee's personnel file pursuant to § 31-128e, then, after removal has occurred, that information should not be "contained in the personnel file" of the employee for purposes of § 31-128f. Because an employee's "written authorization" to disclose information under § 31-128f can only pertain to "information contained in the personnel file," such an "authorization" cannot authorize disclosure of information previously agreed to be "removed." Information of this latter

description is no longer "contained in the personnel file."

### 2

### Application of the Public Policy

With this background, the application of the public policy articulated by the legislature to the agreement signed by the parties is reasonably clear. Paragraph 2 of the agreement provides that, "Any and all references in said file(s) to an involuntary termination of the employment of Giannecchini will be expunged." This is plainly a "removal" agreed upon by the parties for purposes of § 31-128e. Any "authorization" that Giannecchini would later give to disclose information contained in his file would not include "references in said file(s) to an involuntary termination." That "removed" information would no longer be "contained" in his file for purposes of § 31-128f. Giannecchini, who was not the party maintaining the file, was statutorily permitted to make this assumption in giving any later "authorization."

It should be noted that the "removal" provision of paragraph 2 of the agreement is tightly crafted. That provision pertains solely to references "to an involuntary termination." Numerous references in Giannecchini's personnel file, many of them unflattering, do not fall within the ambit of paragraph 2. For example, unflattering references to Giannecchini's ability and industry and Giannecchini's pretermination disciplinary records are not controlled by paragraph 2. Such latter references are, instead, controlled by paragraph 3. Under paragraph 3, information such as this is presumptively not to be disclosed. Such information is still, however, "contained" in the file. If Giannecchini subsequently gives an authorization to disclose information contained in his file, information of this latter description may be disclosed. References "to an involuntary

termination" may *not* be disclosed. The employer and employee have agreed to remove *that* information from the file.

The authorization prepared by the VA contains two important provisions: an "authorization" and a "release." The "release" will be discussed in a moment. For now, let us consider the "authorization." The authorization here authorizes release of information to the VA. On its face, this is quite sweeping. But the "authorization" must be read with Giannecchini's legitimate expectations—expectations legitimized by the provisions of positive law—in mind. In light of both the contract he had signed and the provisions of §§ 31-128e and 31-128f, Giannecchini could legitimately expect that references to his involuntary termination would no longer be contained in his file. We now know, of course, that this was not the case, but when he signed the "authorization" he had no way of knowing this. He was not the party maintaining the file. He had the right— both contractual and statutory—to count on the hospital keeping its word. For this reason, his "authorization" did not authorize the disclosure of references to his involuntary termination.

Unhappily, the evidence establishes beyond the shadow of a doubt that the hospital disclosed references to Giannecchini's involuntary termination to the VA. The hospital's letter of February 14, 1995, expressly states, "He was discharged." Pietrandrea's subsequent telephonic disclosure that " 'All I show here is several serious medication errors' " was an additional disclosure of information agreed to be removed from Giannecchini's file, since that disclosure is a direct quotation from the hospital's termination document giving the stated reason for the termination. The comment of Pietrandrea just quoted makes it clear that her disclosures were based solely on the termination document that the parties had agreed to remove from Giannecchini's

file rather than on personal knowledge of the events in question. These disclosures constituted a clear breach of contract. It remains to be determined whether Giannecchini's breach of contract claim is precluded by his "release."

### 3

### The "Release"

The authorization prepared by the VA and signed by Giannecchini purports to "[r]elease from liability all those who provide information to the VA in good faith and without malice . . . ." Is such a release effective in the context of this case?

The context of the case is a matter of much importance. The question of the validity of discharges from liability ordinarily arises in negligence cases. The law pertaining to this issue has not been settled in Connecticut. "[A]n agreement exempting one from liability for future damage caused by simple negligence will generally be upheld. Such releases are not favored, however, and, if possible, the contract will be construed not to confer this immunity." 8 S. Williston, Contracts (4th Ed. Lord 1998) § 19:24, pp. 300–303.

In the context of employment references, releases are generally held enforceable. See *Cox* v. *Nasche*, 70 F.3d 1030, 1031 (9th Cir. 1995), and authorities cited therein. The hospital understandably places great reliance on this line of authority. But the context in which that authority has been articulated is quite different from the context of the present case. In the typical case—*Cox* is a good example—the employee signing a release knows full well that, as a result of his authorization, his former employer will make an unlimited disclosure of information. Such an employee can hardly complain when his former employer does precisely

what he has authorized it to do. A release of liability in such a context ordinarily should be enforceable.

Giannecchini's case, however, is different. When Giannecchini signed the release at issue in this case, he did so against the backdrop of a contractual agreement with the hospital requiring removal of information from the hospital's files and a highly articulated statutory scheme that gave him legitimate reason to assume that "removed" information would not be disclosed pursuant to a subsequent "authorization." Because Giannecchini was not the party charged with maintaining the hospital's files, he had no way of knowing that the hospital had not been true to its word.

Could a release be designed that would allow the hospital to disclose the termination records that it had promised to expunge? The answer is probably yes, but the release in question here was not such a document. The release in question here is a form document prepared by the VA and stands in sharp contrast to the carefully drafted agreement executed by the parties. The release here makes no disclosure of the fact that the hospital has violated its contractual and statutory obligation to expunge the information it had agreed to expunge. No evidence has been submitted that Giannecchini had any ability to bargain with respect to the form release presented to him by the VA, and the likelihood that he had any such bargaining ability seems minimal. Any bargaining here would, in any event, have been a game of blind man's buff, since Giannecchini was dealing with the VA, which had no knowledge of the hospital's failure to comport with its agreement, and not with the hospital, which was the only party to have such knowledge. The law is reluctant to enforce exculpatory agreements executed under these circumstances. See *Tunkl* v. *Regents of University of California*, 60 Cal. 2d 98–101, 383 P.2d 441, 32 Cal. Rptr. 33 (1963); *Adloo* v. *H. T. Brown Real Estate, Inc.*, 344 Md. 254, 260, 686

A.2d 298 (1996); *Yauger* v. *Skiing Enterprises, Inc.*, 206 Wis. 2d 75, 84, 557 N.W.2d 60 (1996).

To enforce the release under these circumstances would not only allow the hospital to violate its contractual and statutory expungement obligations with impunity, but would render Giannecchini's legitimate expectations with respect to his contractual and statutory rights meaningless. The court will not follow down this path. The evidence submitted by the parties establishes as a matter of law that the hospital has breached the contract executed by the parties and that the "release" signed by Giannecchini is not judicially enforceable in these circumstances. Although, as mentioned at the beginning of this discussion, reasonable persons can disagree as to the public policy aspects of this outcome, the controlling public policy here has been articulated by the legislature. Judgment as to liability must enter in favor of the plaintiff on the first count of his revised amended complaint.

### IV

### THE BREACH OF COVENANT CLAIM

The second count of the revised amended complaint can be swiftly dealt with. That count alleges that the agreement executed by the parties "contained a covenant of good faith and fair dealing that neither party would do anything to injure the right of the other party to enjoy the benefits of the contract." It further alleges that the hospital violated this covenant by the actions that have already been described.

As has already been discussed, the contract executed by the parties contained highly specific provisions governing the hospital's responsibilities with respect to the disclosures at issue in this case. In addition, as also discussed, the contract was executed against the backdrop of highly articulated statutory law. Under these

circumstances, it would be inappropriate for the court to insert additional provisions into the agreement. Giannecchini's case must rise or fall on the strength of his contractual and statutory claims. Judgment must enter in favor of the defendant on the second count of the revised amended complaint.

V

THE DEFAMATION CLAIM

The third count of the revised amended complaint alleges defamation. That count alleges that the hospital's written and oral statements already described "falsely and intentionally portrayed the Plaintiff as an employee who was discharged for alleged performance problems [including that he had committed medication errors] and would not be eligible for re-hire by Defendant Hospital. The Defendant Hospital also falsely stated that the Plaintiff was an R.N.-I for four (4) years which further already reflected on the Plaintiff's professional skill, ability and reputation." A defamation plaintiff bears the burden of proving that the statements made concerning him were false; see *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 795, 734 A.2d 112 (1999); and, as the complaint makes clear, the falsity of these asserted statements is an express part of Giannecchini's claim.

The second sentence of the claim just quoted can be swiftly dealt with. The evidence establishes that the hospital did not state that "the Plaintiff was an R.N.-I for four (4) years." The communication referred to is the letter of February 14, 1995. That letter states that "Giannecchini was employed at the Hospital of St. Raphael from 1/16/89 to 3/24/93. He was an R.N.-I." Both of these sentences are perfectly true. There is no actionable falsehood in this portion of the communication.

The same letter also states that, "He was discharged. He is not eligible to be re-hired." The alleged falsity of this statement presents a somewhat more intricate problem. Under the agreement, as mentioned, Giannecchini was allowed to resign voluntarily. It is also true, however, that Giannecchini was terminated. The hospital has presented incontrovertible documentary proof establishing the truth of that statement. There is, in any event, nothing in the contract signed by the parties that makes Giannecchini eligible to be rehired. It is clear that the statement that, "He is not eligible to be re-hired" is true. The only question is the truth or falsity of the statement, "He was discharged." The documentary evidence presented by the parties establishes that this statement is historically true. For this reason, judgment must enter in favor of the defendant on the third count of the revised amended complaint.

## VI

## CONCLUSION

For the reasons stated above, the plaintiff's cross motion for summary judgment is granted (as to liability only) as to the first count of the revised amended complaint and denied as to the second and third counts of that complaint.

The defendant's motion for summary judgment is denied as to the first count of the revised amended complaint and granted as to the second and third counts of that complaint.

The court commends the attorneys in this case, Stephen Courtney, representing the plaintiff, and Lori Alexander, representing the hospital, for the exceptionally high quality of their briefs and oral arguments. The skill with which they have zealously represented their clients in a hard fought case and the lucidity of their arguments have been in the highest traditions of the profession.